COUNTRYWIDE HOME LOANS, INC.
d/b/a America's Wholesale Lender,
for the benefit of UBS Warburg Real
Estate Securities, Inc.,
Plaintiff-Appellant,†

v.

Gary C. SCHMIDT, unknown spouse of
Gary C. Schmidt, and Wisconsin Department
of Workforce Development,
Defendants-Respondents,

Jeanne MAYER,
Defendant-Third-Party Plaintiff-Respondent,

v.

Todd A. BRUNNER, Third-Party Defendant.

Court of Appeals

*No. 2006AP2908. Submitted on briefs August 30, 2007.*
*—Decided October 10, 2007.*

2007 WI App 243

(Also reported in 742 N.W.2d 901.)

† Petition to review denied, with $50 costs. 12/19/07.

201

On behalf of the plaintiff-appellant, the cause was submitted on the briefs of *Penny G. Gentges* and *Arthur M. Moglowsky* of *Bass & Moglowsky, S.C.*, of Milwaukee.

On behalf of the defendant-third-party plaintiff-respondent, the cause was submitted on the brief of *David A. Wanta* of *Trapp & Hartman, S.C.*, of Brookfield and *Kent A. Tess-Mattner* of *Schmidt, Rupke, Tess-Mattner & Fox, S.C.*, of Brookfield.

Before Brown, C.J., Nettesheim and Snyder, JJ.

¶ 1. BROWN, C.J. Equitable subrogation is a doctrine whereby one who has paid off another's mortgage obligation is treated as the owner of that obligation. In this case, Countrywide Home Loans, Inc. lent Gary Schmidt $360,000 secured by a home mortgage. There was a problem, though—at the time Countrywide lent Schmidt the money, the house was no longer Schmidt's

to mortgage. Jeanne Mayer had contracted to buy it for $300,000 and had sued Schmidt for specific performance when he tried to back out on the deal, all before Countrywide entered the picture. Eventually, realizing that Mayer's superior claim on the property rendered its $360,000 mortgage worthless, Countrywide fell back on the fact that it had paid off two prior mortgages totaling about $260,000. The circuit court allowed Countrywide to recoup the $260,000, but Countrywide claims it is entitled to more: it wants Mayer to pay interest on the old mortgages, along with taxes and insurance that it paid, all adding up to $320,000—or $20,000 more than Mayer's purchase price for the property. It claims that *Iowa County Bank v. Pittz*[1] establishes the "bright-line rule" that this is what an equitable subrogee gets. We disagree and affirm the circuit court. Equitable subrogation is a creature of equity, the object of which is to do substantial justice independent of form or contract relation between the parties. The *Pittz* court did substantial justice on the facts of the case before it, and we cannot say the circuit court here did not do the same.

¶ 2. The relevant facts are undisputed. Schmidt owned a property at 308 W. Wisconsin Ave. in Pewaukee. In 2002, Schmidt took out two loans from two different banks, one for $176,000 and one for $90,000, and issued each bank a mortgage on the property. In September 2003, Schmidt accepted Jeanne Mayer's offer to buy the property for $300,000, but in October he tried to rescind the deal and Mayer sued for specific performance. Mayer also recorded a lis pendens with the Waukesha register of deeds, and though the lis

---

[1] *Iowa County Bank v. Pittz,* 192 Wis. 83, 211 N.W. 134 (1926).

pendens correctly described the location of the property at issue, it was incorrectly captioned "Milwaukee County." Mayer later recorded a corrected lis pendens.

¶ 3. In November 2003, while Mayer's suit was pending, Schmidt obtained a loan from Countrywide for $363,750. Countrywide paid off the mortgages to the prior banks for a total of $260,275.07, with the remainder of the money going to Schmidt. Schmidt gave a mortgage to Countrywide for $363,750. This mortgage was recorded in February 2004.

¶ 4. In September 2004, Mayer won her lawsuit against Schmidt in the circuit court and was awarded specific performance. Schmidt appealed.

¶ 5. In November 2004, Countrywide began a separate action against Schmidt, seeking to foreclose on its mortgage for nonpayment. It named Mayer as a defendant by virtue of her judgment against Schmidt. Mayer answered that her interest in the property was superior to Countrywide's mortgage. She then moved for summary judgment, arguing that her lis pendens along with her specific performance judgment prevailed over Countrywide's mortgage.

¶ 6. The summary judgment motion was put on hold while the parties awaited this court's decision in the Schmidt-Mayer specific performance case. In the meantime, Countrywide amended its complaint to add its equitable subrogation claim. In November 2005, this court affirmed the grant of specific performance to Mayer.

¶ 7. On the summary judgment motion in this action, Mayer and Countrywide stipulated that Countrywide was entitled to equitable subrogation, but disputed the amount it was due. The circuit court sided with Mayer, stating that the equities were in her favor

and allowing Countrywide only the $260,275.07 it had paid to the prior mortgagees. Countrywide appeals.

¶ 8. Before we get to the substance of Countrywide's equitable subrogation claim, we address its argument that Mayer has waived her right to contest the amount she owes. Countrywide relies on a paragraph from our unpublished opinion in the specific performance case, *Mayer v. Schmidt*, Nos. 2004AP2719, 2004AP3140, unpublished slip op. at 2 (WI App Nov. 16, 2005). There, we were addressing Schmidt's claim that his contract with Mayer was void because its terms were illusory. *Id.* Schmidt pointed to a paragraph of the contract rider giving the seller the right to cancel "if those who hold . . . mortgages against the subject premises do not allow . . . sale on terms and conditions acceptable to Seller." *Id.* We stated that any ambiguity in this clause was moot because Mayer had waived the provision. *Id.* It is plain that by this we meant that she had rendered it moot by agreeing to pay in cash at closing, rather than paying in installments on a land contract, as the original offer provided. With Mayer paying cash up front, the mortgagors would get paid immediately and thus would not stand in the way of the sale. Countrywide seizes on the word "waived" and claims that it means Mayer has forgone not only the right to dispute the terms of the original mortgages, but also the right to dispute the amount of Countrywide's equitable subrogation claim. We think stating this claim demonstrates its speciousness, and so we will leave it at that.

¶ 9. Turning to the central issue of this case, Countrywide claims that "Wisconsin law is clear that a party who is deemed the equitable subrogee of a paramount lien is entitled to 'have it maintained as it was

originally.' " That is, Countrywide argues that an equitable subrogee "steps into the shoes" of the original lienholder and is entitled to receive whatever that original lienholder would have received had the original debt not been paid off. Had the banks holding the two original mortgages not been paid off, interest would have continued to accumulate after the closing date, during the pendency of the specific performance suit, and right up until the deal was done and the mortgage notes were paid. Thus, Countrywide argues, relying chiefly on *Pittz*, that it is entitled to this same interest.

¶ 10. We do not agree that *Pittz* established a "bright-line rule" that an equitable subrogee may always have interest at the rate of the prior mortgage. A brief discussion of the relevant facts of that case is necessary to understand its holding and its relevance to this case.

¶ 11. In 1911, William Murphy Sr. purchased farmland from Demuth, paying part in cash and also giving a mortgage for $10,500 due in ten years at 5% interest. *Pittz*, 192 Wis. at 84. Demuth later sold the mortgage to Schaumberg; part of the money Schaumberg used for the purchase was a loan from his son-in-law, Pittz. *Id.* Meanwhile, Murphy Sr. transferred possession of the farm to his son, Murphy Jr., but retained ownership pursuant to a land contract. *Id.* The Murphys then went to the Iowa County Bank and executed two mortgages, one on the subject farm and the other on another farm owned by Murphy Jr. *Id.* at 85. The mortgages were given not for new loans, but for debts already owed by the Murphys. *Id.* at 84–85.

¶ 12. Meanwhile, with the original $10,500 mortgage coming due, Murphy Jr. went to Pittz and asked him to pay it off to Schaumberg's estate (Schaumberg having died) as Murphy Jr. did not have the money. *Id.*

at 84–85. Pittz agreed to do so, in exchange for a new mortgage at 6%, instead of the old 5%. *Id.* at 85. Pittz, of course, thereby went from holding a stake in the first mortgage to holding the second one, since the bank's mortgages now preceded his. *See id.* at 88. To make matters worse, he had gotten his new mortgage from Murphy Jr., when it was Murphy Sr. who owned the farm. *See id.* at 86. He eventually corrected this by getting Murphy Sr. to execute a new mortgage, but not before both of the Murphys signed one more mortgage with the bank for $7140, $6500 of which was for the indebtedness that had previously been secured by Murphy Jr.'s other farm, the rest being for a new $640 loan given by the bank to Murphy Jr. *See id.* at 86–87. The bank also agreed that the interest rate on the older notes would decrease to 6% from 7%. *Id.* at 87.

¶ 13. The bank brought a foreclosure action; Pittz claimed that he was equitably subrogated to the original $10,500 loan and thus maintained his priority over the bank's later mortgages. *Id.* The supreme court agreed that Pittz should be subrogated. *Id.* at 92. Specifically, it held that he could maintain his $10,500 lien as against the bank, but only at the original 5% interest rate, rather than at the 6% rate he had obtained after the bank had received its mortgages. *Id.* Further, the bank was entitled as against Pittz to receive the $640 (plus interest) that it had loaned to Murphy Jr., along with the difference between the original 7% interest on the old mortgages and the 6% interest it had agreed to in consideration for its last mortgage from the Murphys. *Id.* at 92–93.

¶ 14. Countrywide makes much of the fact that Pittz was allowed the 5% interest rate of the original loan, asserting that the case therefore established a general rule that an equitable subrogee is "entitled to

enforce the mortgage . . . according to the mortgage's original terms, and is entitled to unpaid interest at the subrogated mortgage's original rate from the date the subrogee steps into the shoes of the original lender." Nowhere did the court explicitly announce such a general rule; it simply stated that the original interest rate was what Pittz was entitled to. *Id.* at 92. The court noted that the equitable subrogation doctrine was one of "pure, unmixed equity," *id.* at 89, and went on to list nine "features" of the case that would "control its disposition," *id.* at 89–90—hardly the words of a court applying a simple bright-line rule. The court also characterized the case as an "extreme case." *Id.* at 92.

¶ 15. It is plain that what the court did in *Pittz* was balance the equities between the parties. As to Pittz, he had been a stakeholder in the original, paramount mortgage, because he had lent money for its purchase. He had paid that mortgage off in order to protect his investment (along with his other interests in the resolution of the Schaumberg estate), *id.* at 85, and the court declared that there were "no equities equal or superior to those of Pittz." *Id.* at 92. Meanwhile, the bank had advanced no money for its original mortgages to the Murphys, and would merely "obtain[] an unbargained-for advantage" if allowed to claim first lien position. *Id.* at 90. The court was not interested in the Murphys' stake in the outcome, because of their attempts to take advantage of Pittz. *See id.* at 90.

¶ 16. Thus, the court allowed Pittz to receive what he would have received under the original mortgage, including his 5% interest, because it found that to be the equitable thing to do. Pittz was not entitled to his higher 6% rate of interest because he had bargained for that as part of his second mortgage, a mortgage that was subsidiary to the bank's interest. The bank could

not complain regarding its original mortgages because they had been subsidiary to Pittz's; the bank therefore lost nothing it was entitled to or had bargained for. However, the court did allow the bank to recover against Pittz for everything it had given to the Murphys after Pittz had paid off the first mortgage and before he finally got the new one from Murphy Sr.; that is, in reliance on the fact that it was now in the first lien position.

¶ 17. We thus do not view *Pittz* as a statement of a bright-line rule. Indeed, the bright-line rule that Countrywide claims to find there—that the terms of the original mortgage contract dictate the rights of the subrogee without exception—would be very difficult to square with the principle that the object of subrogation is "to do substantial justice independent of form or contract relation between the parties." *Rock River Lumber Corp. v. Universal Mortgage Corp. of Wis.*, 82 Wis. 2d 235, 241, 262 N.W.2d 114 (1978) (citation omitted).

¶ 18. Instead, we view *Pittz* as a textbook case of balancing the equities. It is often stated that the equitable subrogation rule can only be applied to the extent that does not injure innocent third parties. *See Rock River Lumber Corp*, 82 Wis. 2d at 241; RESTATEMENT (THIRD) OF PROPERTY: MORTGAGES § 7.6(b)(4) (1997) (subrogation is appropriate if it "will not materially prejudice the holders of intervening interests in the real estate"). The bank in *Pittz* was not injured by Pittz's equitable subrogation because the bank's interest remained the same as it would have been had Pittz not paid off the first mortgage and taken a second.

¶ 19. Countrywide argues that the situation here is the same: had Countrywide not paid off the two

earlier mortgages, they would still be in place and accumulating interest at their old rates. Thus, Countrywide being subrogated to those loans leaves Mayer no worse off than she was before the old mortgages were refinanced. But the facts remain that the mortgages *were* refinanced, and that, until fairly recently, the total amount "due" on those mortgages has been less than Mayer's $300,000 purchase price. Because of these two facts, during Mayer's legal battles of the past four years, she has been operating under the reasonable assumption that if she were successful in her specific performance case, she could get what she bargained for.

¶ 20. Mayer filed her specific performance suit in October 2003. In November 2004, she was named in Countrywide's foreclosure action, and presumably learned that the two prior mortgages had been paid off. Looking to the record, we find that it was not until August 2005 that Countrywide first made its equitable subrogation claim, thus potentially putting the two old mortgages back in play. Not until August 2006, in its summary judgment brief, did Countrywide announce that it was seeking to enforce those old mortgages in an amount *greater* than Mayer's purchase price for the property. Mayer had little or no reason to be concerned about the old mortgages until Countrywide claimed that it had the right to enforce them for more than $300,000. She might well have conducted herself differently throughout the proceedings had she known that interest was "accumulating" on mortgages that no longer existed: for example, she could have walked away from the transaction, or asked the court to order Schmidt to make the necessary payments to preserve the status quo. It is simply not true that Mayer is no worse off if Countrywide is allowed equitable subrogation that exceeds her bargained-for purchase price.

210

██

¶ 21. Of course it is not Countrywide's fault that Schmidt delayed the sale of the property so that the original mortgages would now cost more than $300,000 to pay off, but neither is it Mayer's.[2] Mayer's actions in this transaction and its attendant litigation are blameless, and the circuit court clearly had this in mind when it found that equity required that she be held harmless —just as the supreme court held the bank harmless for its good-faith dealings in *Pittz*. *See Pittz* at 92–93. The circuit court thus allowed Mayer to enforce her contract as written, and not pay Countrywide more than the purchase price of the property for mortgages it did not hold.[3]

██

¶ 22. Countrywide's last claim is that the circuit court erroneously exercised its discretion by citing "undefined equitable principles" to limit Countrwide's recovery in this case. We cannot deny that the circuit court, in giving its oral decision in this case, did not state its reasoning as clearly as it might have. Nevertheless, the circuit court did note that its role in the case was to do equity, and that the equities weighed in favor of Mayer. Each side capably put forth its factual and legal arguments below, and we are confident that the circuit court weighed them in its decision. Further, even when the circuit court does not adequately explain its reasoning, we may search the record to determine if

---

[2] Though it is true, as Mayer points out, that the legal battle Schmidt waged against her in the specific performance action may well have been funded by Countrywide's ill-advised loan.

[3] As for the difference between the $300,000 purchase price and the $260,000 the circuit court awarded Countrywide, we note along with Mayer that Countrywide may pursue Schmidt for the money that he still owes on its loan.

it supports the court's discretionary decision. *Randall v. Randall*, 2000 WI App 98, ¶ 7, 235 Wis. 2d 1, 612 N.W.2d 737. As our discussion above shows, we have no trouble here concluding that it does.

*By the Court.*—Judgment affirmed.